## GALLENA v. HOT SPRINGS RAILROAD.

*(Circuit Court, E. D. Arkansas. April Term, 1882.)*

**1. RAILROADS—EJECTING PASSENGER FROM TRAIN.**

Where the legal right of a conductor of a railroad train to eject or remove a passenger from the cars exists, he must effect the removal at a proper place and in a proper manner, and with no more confusion, force, or violence than is reasonably necessary for the purpose.

**2. SAME—DUTY OF CONDUCTOR IN EJECTING PASSENGER.**

Before a conductor can require a passenger to get off the cars he should stop the train at a station or depot, or where he could be put off without injury or danger of injury. He has no right to forcibly eject a passsnger at such a place and in such a manner as his whim, caprice, or malice may dictate or suggest.

**3. SAME—ACTION—PROVINCE OF JURY.**

In an action for damages for violent ejection from a car by the conductor, it is the province of the jury to reconcile difference in the testimony, and to decide as to the credibility of the witnesses, taking into consideration the relation they sustain to the case, their probable motives, their demeanor, and their opportunities of knowing and seeing the facts about which they testify, and the reasonableness or unreasonableness of their testimony, in view of the knowledge of human nature, and the established and undoubted facts in the case.

**4. ASSAULT ON PASSENGER.**

Where a conductor, with a loaded revolver in his hand, approaches a passenger before making, any effort to induce him to get off, and when the passenger had not made, or threatened to make forcible resistance to his authority, the conductor is guilty of a gross outrage.

**5. SAME—THREATS.**

With or without the use of a deadly weapon, a conductor has no right to compel a passenger, by commands or threats, to jump from a moving train.

**6. RAILROAD COMPANIES—DUTY OF—LIABILITY.**

The law makes it the duty of railroad companies to employ competent, safe, and civil men to discharge the duties of a conductor, and for the assaults, injuries, and wrongs inflicted on a passenger by a conductor in the course of his employment as such, the railroad company is responsible.

**7. SAME—DAMAGES—EXEMPLARY DAMAGES.**

> Where the plaintiff was put off the train in an improper manner and in an improper place, he is entitled to recover a reasonable compensation for bodily injury, and mental suffering and anguish, resulting from the assault; and where the injury has been wanton and malicious, a further compensation by way of punishment or exemplary damages, in the discretion of the jury.

*Casey Young* and *G. W. Gordon,* for plaintiff.

*John M. Moore,* for defendant.

CALDWELL, D. J., (*charging jury.*) The plaintiff, a citizen of Memphis, Tennessee, on the twenty-eighth of July, 1881, purchased an excursion coupon ticket from Memphis to Hot Springs and return, good until the thirty-first day of August of the same year. He traveled on this ticket from Memphis to Hot Springs, and on the eighteenth day of August, with his wife and daughter, who had preceded him to the springs, took passage on defendant's train at Hot Springs to return to Memphis. When the conductor of the train came to plaintiff for his ticket, which he did according to custom soon after the train left Hot Springs, the plaintiff tendered to him the excursion ticket before mentioned. This ticket the conductor refused to honor, saying that before he could accept it the plaintiff must present it to the defendant's agent at Hot Springs, identify himself, and sign the ticket, and have the agent at that place stamp it. The plaintiff offered to identify himself to the conductor, and sign the ticket on the train, or to do the same before the agent of the defendant company on the arrival of the train at Malvern, but the conductor declined to permit him to do so, and required him to leave the train at once. The train was then stopped, and in compliance with the demand of the conductor the plaintiff got off, but on receiving assurance from one or more passengers on the train that his ticket was good, and to get on the car again, he did so.

The conductor did not see the plaintiff at the time he got on after being put off, but in a short time afterwards, seeing the plaintiff on the train, proceeded to put him off a second time, in the manner and under the circumstances detailed to you in the testimony.

The questions in the case to be determined by the court and jury are:

(1) Did the conductor have a legal right to put the plaintiff off the train? (2) If he had such right, was it exercised in a proper manner and at a proper place? (3) If the conductor had either no right to put the plaintiff off the train, or if, having the right, he exercised it in an improper manner and at an improper place, what damages shall the plaintiff receive for such wrongful act?

1. That the plaintiff purchased and paid for the excursion ticket mentioned, and that he was the *bona fide* holder of the same at the time he was put off the train, is not contested.   But there are certain conditions or stipulations contained on this ticket, to which the plaintiff subscribed, the fifth of which reads as follows:

"It is not good for return passage unless the holder identifies himself or herself as the original purchaser to the satisfaction of an authorized agent of the Hot Springs Railroad; and when officially signed and dated in ink, and duly witnessed and stamped by said agent, this ticket shall then be good only one day after such date, and in no case after the thirty-first day of August following date of sale."

And these further stipulations comprise a part of the contract signed by the plaintiff;

"Unless all the conditions on this ticket are fully complied with, it shall be void."

"In consideration of the reduced rate at which this ticket was sold, I agree to the above contract."

The contract is signed by the plaintiff and the agent of the railroad company, and immediately below the first coupon on the return part of the ticket is this notification:

"To PURCHASERS.—Read the contract and take notice that the return part of this ticket must be stamped and your signature witnessed by a ticket agent of the Hot Springs Railroad before it will be honored for passage."

The following is the sixth clause of the contract subscribed by the plaintiff:

"I, the original purchaser, hereby agree to sign my name, and otherwise identify myself as such, whenever called upon to do so by *any* conductor or agent of the *line or lines* over which this ticket reads.'

Confessedly this sixth clause, taken by itself, would imply that all the holder had to do was to sign his name and identify himself as the original purchaser when *called upon to do so by any conductor or agent* of the railroad company, and that until such demand was made upon him he had nothing to do.   But in the opinion of the court this sixth clause does not annul or supersede the requirements of the fifth clause, but they both stand and are effectual for the purpose for which they were severally intended.   If the usual full-fare tickets issued to passengers contained like conditions with those on this ticket, the purchaser whose attention was not expressly called to them before he took passage, and who did not assent to them, would probably not be bound thereby.   But where one without being induced thereto by fraud signs a contract for a special-rate ticket, the law

conclusively presumes he knows the contents of such contract, and he is bound thereby.

It follows, therefore, that the plaintiff should have identified himself to an agent of the defendant company, and otherwise complied with the requirements of the fifth clause of the contract, before taking passage on the train at Hot Springs, and that not having done so he had not, under the terms of the contract between himself and the company, the right to return on that ticket. It matters not that the plaintiff was in fact the original purchaser of the ticket, and that he was ready and offered to sign the ticket, and identify himself as such to the conductor on the train, or to the agent at Malvern, upon the arrival of the train at that place. This is a technical and strict legal construction of the contract, but it is one the railroad company had a right to insist on; and standing on its strict legal rights under the contract between itself and the plaintiff, the conductor had a right to refuse to honor the plaintiff's ticket, and require him to leave the cars; and if the plaintiff declined to do so, the conductor had a strict legal right to remove him therefrom *at a proper place and in a proper manner.* "The law allows it, and the court awards it."

2. But where the law gives the conductor this right, it at the *same time regulates the mode of its exercise.* Where the legal right to eject or remove a passenger from the cars exists, the law does not invest the conductor with the power to effect the removal at such place and in such mode and manner as his whim, caprice, or malice may dictate or suggest. But the removal must be effected at a proper place, and with no more confusion, force, or violence than is reasonably necessary for the purpose. This is due to the other passengers on the train, no less than the passenger ejected. Especially is this rule applicable to a case where the passenger is on the train in good faith, holding a ticket for which he has paid the required price, but which he cannot legally require the conductor to honor, on account of a mere oversight to comply with some of its numerous conditions, or an honest misinterpretation of them on his part, or more likely from an utter ignorance of their existence. A passenger on a train under such circumstances is not to be regarded or treated as though he were a felon or an outlaw.

Applying these general principles of law to the case at bar, I instruct you that before the conductor required the plaintiff to get off the train he should have stopped it at a station or depot where the plaintiff, if he had chosen so to do, could have got off without danger,

or where, if he declined voluntarily to get off, he could have been put off without injury or danger of injury of any kind except such as he might necessarily and justly bring upon himself by forcible resistance to the lawful authority of the conductor. Where the right to put a peaceable passenger off the train exists, it must be exercised at a station or depot. The humanity and justice of the law will not permit a conductor to put such a passenger off the train at any place his caprice may suggest. If the law were otherwise, it would be in the power of a conductor to inflict great oppression on a passenger whom he had the right to remove from his train. A passenger put off between stations on roads running through swamps or other unsettled districts might suffer great hardships, and even perish, before he could reach shelter or food.

The conductor himself testifies that the plaintiff not only made no forcible resistance to his authority, but that he never threatened nor intimated that it was his purpose to do so at any time. He told the conductor that while he would offer no resistance to being put off, he would not voluntarily get off, because he believed his ticket was good, and he wanted to test his right to ride on it. The conductor further testifies that before making any effort to induce plaintiff to get off the car the second time, he went to the baggage car and procured a loaded revolver, of the army size, with which he returned to the car in which the plaintiff and other passengers were riding, and that holding the revolver in his right hand he laid his left hand on the plaintiff and conducted him to the platform of the car, and there required the plaintiff to jump off, which he did while the train was running at a low rate of speed, and at a place where there was a ditch four or five feet deep, into which the plaintiff was precipitated. The place where this occurred was some two miles or more from any station or depot. The conductor says he was not angry or violent in his deportment to the plaintiff at this time, and that he did not forcibly fling him off the platform into the ditch.

The plaintiff and many other witnesses who were in the car as passengers testify that the conductor was angry and insulting and threatening in his manner and language in a high degree, and that he hurled the plaintiff from the platform into a ditch six or eight feet deep, with great force and violence, when the speed of the train was from eight to twelve miles an hour, to the imminent peril of his life and limb. And the passengers testify that immediately after throwing the plaintiff from the train, the conductor placed himself in the

door of the passenger car, and flourishing his six-shooter in the face of his passengers cried out, "Is there anybody else in here wants any of this ?"

It is your province to reconcile all differences in the testimony of the witnesses if you can do so, but if the difference is irreconcilable, then you will give the credit to those whom you believe speak the truth; and in determining who you will believe you will take into consideration the relation they sustain to the case, the probable motives, if any, that influence them in giving their testimony, their demeanor on the stand, their opportunities to know and see the facts about which they testify, and the reasonableness or unreasonableness of their testimony, in view of your knowledge of human nature, and the established and undoubted facts in the case.

The following is an extract from the testimony of the conductor :

*By the Court. Question.* Had the plaintiff himself exhibited any weapon ? *Answer.* No, sir. *Q.* Had he made any forcible resistance? *A.* No, sir.

*By Mr. Moore. Q.* Do I understand you to state that it was your object in getting that pistol to prevent these passengers from assisting Gallena on the train; that you thought from their statements they were going to interfere? *A.* Yes, sir; that is my simple reason.

*By Col. Young. Q.* That you got that pistol for the purpose of using it on Gallena or some one else? *A.* No, sir.

*By the Court. Q.* You say that plaintiff had not made any forcible resistance, or offered any? *A.* No, sir. *Q.* Had he intimated any? *A.* Not that I heard. *Q.* Had any person made any exhibition of violence towards you? *A.* No, sir; except by language. *Q.* When you found that he was on the train what effort did you make to put him off, or induce him to get off before you got the pistol? *A.* None whatever. *Q.* What kind of a pistol was it? *A.* It was a revolver, army size; six-shooter.

In approaching the plaintiff in a menacing manner with a loaded army revolver in his hand, before making any effort to induce him to get off, or to put him off, and when the plaintiff had not made, or threatened that he would make, any forcible resistance to his authority, the conductor was guilty of a gross outrage, not only on the plaintiff, but as well upon all other passengers whose lives would be put in peril by the use of such a deadly weapon in the car, and who could not fail to be justly alarmed and disturbed by its exhibition under the circumstances. Conductors have no right to draw a deadly weapon on a passenger who is quiet and peaceable, and who has not offered, and is not threatening, any violence to the conductor or other passengers. Deadly weapons of such a character are never to be brought into requisition by a conductor of a passenger train ex-

cept to protect himself, or the passengers under his charge, from deadly or unlawful assaults. He cannot collect fares, or compel passengers traveling without tickets to jump from a moving train, by the use or exhibition of such a weapon. And with or without the use of a deadly weapon he has no right to hurl a passenger from a moving train into a ditch. And to compel the passenger, by commands or threats, to jump from a moving train into a ditch, is as much a violation of the law and the rights of the passengers, as if the conductor had hurled him from the car by actual physical force. The office of conductor of a passenger train is an exceedingly important and responsible one. There are few positions which demand of their incumbents more good judgment and self-possession. Not only the peace and comfort, but the lives as well, of passengers are in their keeping. They must not, by any act of their own, disturb the one or endanger the other. They have to deal with all classes of people. They daily come in contact with the unscrupulous and dishonest, who are seeking to defraud the railroad company of what is justly its due, and are often grossly insulted by the ignorant and vulgar for a lawful and proper discharge of their duties. It is obvious that if a conductor was to attempt to redress every personal insult, or enter a boisterous quarrel with every vulgar and rude person who might invite it, there would be no peace or safety for his passengers. He must decline all such contests. He can take action only in those cases where the rights of the railroad company, or the peace or safety of the passengers under his charge, or his own safety, demand it. And then he can only act in the mode and manner heretofore indicated, accomplishing what he has a right to do in the given case with as little force, violence, and confusion as is practicable and reasonable under the circumstances.

The remarks of one or more of the passengers to the plaintiff when put off the train the first time, to the effect that his ticket was good, and to get back on the train; that if he paid his fare the conductor would probably appropriate it to his own use,—were uttered, the conductor himself testifies, without any exhibition or threat of violence, and, however irritating to the conductor, constituted no justification or excuse for his subsequent treatment of the plaintiff, nor for his menacing with a six-shooter a car full of peaceable passengers. Words, however irritating or approbrious, will not justify an assault by one under no special obligation to keep the peace; much less will they justify an assault by a conductor, who is, by virtue of his position, not only bound to keep the peace himself, but whose duty it is

to maintain peace and order in the cars, and protect the passengers in his charge from assaults and violence.

The law requires railroad companies to carry their passengers safely and treat them respectfully. They are under obligations to use proper precautions and exertions to protect passengers while in the cars from the violence and insults of strangers and co-passengers, and they are bound, of course, to protect them from the assaults, insults, and violence of their own conductors and servants. They select and appoint their own conductors without consulting their passengers, and it is but reasonable that they should be held responsible for any act of violence to the passengers of which the conductors may be guilty. The moment the passenger enters the car he is more or less under the control of the conductor, and subject to his orders. Fit or unfit, humane or brutal, good-tempered or morose, the passenger is comparatively helpless, and may be obliged to submit for the time without any means of redress. *Pendleton* v. *Kinsley,* 3 Cliff. 416. The law, therefore, makes it the duty of railroad companies to employ competent, sober, and civil men to discharge the responsible duties devolving on a conductor; and for the assaults, injuries, and wrongs inflicted on a passenger by a conductor, in the course of his employment as such, the railroad company is responsible.

If, applying the rules of law I have laid down to the testimony in this case, you find that the plaintiff was expelled from the car in an improper manner and at an improper place, the plaintiff is entitled to a verdict at your hands, and the only remaining question is as to the amount of damages you will award him.

3. This makes it necessary for the court to instruct you with reference to the rules adopted by the law to guide and govern you in measuring and ascertaining such damages.

Damages are of two kinds: (1) Actual or compensatory damages; (2) exemplary or vindictive damages, or, as it is sometimes called, "smart money." The plaintiff claims to recover both.

If you find the plaintiff was put off the train in an improper manner and at an improper place, then he is entitled to recover a fair and reasonable compensation for the bodily injuries sustained, and the mental suffering and anguish resulting from the assault, indignity, and insult inflicted upon him in the presence of his wife and child, and the other passengers on the train. The plaintiff is not required to prove by witnesses what would under the circumstances be a just and fair compensation for the mental and bodily suffering inflicted upon him.

"The law leaves the amount to your sound judgments, reasonably, fairly and dispassionately exercised. This it does from necessity. If one man owes another so many dollars, or has taken from him so much property, there is something to measure (as the law expresses it) the amount of the damages or the recovery. But in an action of this kind the law is unable to furnish you with any definite rule to measure the damages. It confides it to the sound, temperate, deliberate, and reasonable exercise of your functions as jurymen."

The circumstances which will authorize the infliction by the jury of exemplary damages or smart money is thus stated by the supreme court of the United States:

"Where the injury has been wanton and malicious, or gross and outrageous, courts permit juries to add to the compensation for actual damages something further by way of punishment or example, which has sometimes been called smart money. This has always been left to the discretion of the jury, as the degree of punishment to be thus inflicted must depend on the peculiar circumstances of each case." *Day* v. *Woodsworth*, 13 How. 371: *Milwaukee R. Co.* v. *Arms*, 91 U. S. 489.

You will inquire and decide whether, considering all the circumstances in evidence in this case, it comes within this rule, and is one in which, in addition to compensating the plaintiff for his actual damages, the defendant should also be punished in damages for example's sake.

If you decide to go beyond the limits of compensation to the plaintiff, and enter into the field of exemplary damages, then it is your duty to put yourselves in the situation of the parties as near as may be; to look at all the circumstances under which the conductor acted— at those which are claimed to aggravate and at those which are claimed to mitigate the acts complained of; and in this connection you may consider the character and disposition of the conductor as disclosed by the evidence; whether other passengers holding tickets similar to that of plaintiff's were permitted by the conductor to ride to Malvern and there identify themselves and have their tickets stamped, and whether the railroad company, with a full knowledge of all the facts, approved the action of the conductor and retained him in its service. While, in the language of the supreme court, "it is left to the discretion of the jury" to determine the amount of exemplary damages they will award in cases where they find the injury has been wanton and malicious, or gross and outrageous, yet this is not a discretion to be wildly, wantonly, or recklessly exercised, but it is a discretion to be guided and controlled by the deliberate and impartial exercise of common sense and sound judgment.

And if you find this is a case calling for the imposition of exemplary damages, you should not, in an effort to punish the defendant for the malicious, gross, or excessive action of its conductor, yourselves commit an excess by awarding to the plaintiff an extravagant or unreasonable amount.

You are the sole judges of the facts in the case, the credibility of the witnesses, and the weight to be given to their testimony.

The jury returned a verdict for the plaintiff for $4,900.

The defendant filed a motion for a new trial upon the ground the damages were excessive. This motion, before argument upon it, was withdrawn; the plaintiff agreeing to receive $4,000 in satisfaction of his judgment, in consideration of the speedy payment of that sum and the withdrawal of the motion.